**UNITED STATES of America,**
**Plaintiff,**

**v.**

**BEATTY, INCORPORATED, in personam,**
**and**

**M/V CLARE E. BEATTY, in rem,**
**Defendants.**

**Civ. A. No. 7833–A.**

United States District Court,
W. D. Kentucky,
Louisville Division.

July 2, 1975.

---

George J. Long, U. S. Atty., Louisville, Ky., John J. McLaughlin, Dept. of Justice, Washington, D. C., for plaintiff.

James L. Cobb, Jr., Covington, Ky., W. Waverley Townes, Louisville, Ky., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALLEN, District Judge.

The above-styled case was tried to the Court without a jury and is an action brought by the United States to collect a penalty, pursuant to 33 U.S.C. § 1161(b)(5), which had been assessed administratively by the Coast Guard, and to recover costs of $763.50 which it paid for the removal of oil from the Ohio River.

On September 12, 1972, the Motor Vessel Clare E. Beatty was moored overnight in the vicinity of Louisville, Kentucky. During the early morning hours of September 13th, an underwater hull fitting gave way and a portion of the boat began to fill with water. The ship's Master, John E. Beatty, awoke some time between 5 and 6 a. m. and ascertained that his ship was unstable and in possible danger of sinking. Immediate investigation revealed that the ship's bilge was flooded to a depth of approximately 4 feet and pumps were started in order to avert sinking.

After a portion of the water had been evacuated, Captain Beatty waded into the flooded bilge and discovered the ruptured fitting. The immediate danger having lessened since the pumps were gaining on the flooded hull compart-

ments, the Captain left the ship and went into the City of Louisville to purchase the necessary hardware to accomplish repairs of the ruptured fitting. An 18 year old deck hand with a few months of experience on the river, one Rector Bussell, was left to watch the two pumps, with instructions to shut them down if any oil showed in the water which was being discharged.

During the course of the pumping of the water from the bilge, after Captain Beatty went into Louisville, approximately 5 to 15 gallons of oil was discharged into the river. The presence of the oil spill was discovered by Mr. Norman Wooten of the Ohio River Service Company, who notified the Coast Guard of this discharge.

The discharge caused a film of sheen upon the surface of the water and caused discoloration of the surface of the water, and it was established by laboratory tests that the oil which had been discharged was chemically the same as that oil used by the M/V Clare E. Beatty.

When the Captain of the Louisville Coast Guard, hereafter referred to COTP, was notified of the discharge, he immediately contacted the Louisville Area Industrial Mutual Aid, hereafter referred to LAIMA, for the purpose of having it remove the oil from the waters of the river. At that time, the wind was from the west or northwest and the oil was not spreading, since the wind was of such velocity that it prevented the water, which contained the oil sheen, from moving downstream. LAIMA, which is an association of oil companies and various other companies in Louisville, whose purpose is the removal of oil spillages from the Ohio River, sent its crew of oil removal personnel, together with two large pumps, to contain the oil spill and to remove it from the river. This they succeeded in doing and the bill rendered for their services was $763.50, which was paid by the plaintiff.

Captain Beatty arrived on the scene shortly after the removal operations had begun and protested that he had equipment which would accomplish the same as the LAIMA equipment and at no cost to the government or himself. His protests were overruled by COTP, presumably upon the grounds that LAIMA had already been summoned and was at the scene of the discharge. Subsequent to the events of September 13, 1972, plaintiff sent notice to Beatty, Incorporated, by letter dated September 14, 1972, stating there might be a violation of 33 U.S.C. § 1161(b)(4) and (b)(5) and 33 U.S.C. § 407, and requested a statement from the defendant concerning the alleged violation.

The letter also stated that if the Coast Guard's final report showed that a violation had occurred, defendant would be notified and a civil penalty might be assessed which could be appealed at an informal hearing with a Coast Guard officer. After Captain Beatty's response to this letter had been received, the Commander of the Coast Guard, Chief Environmental Protection Branch, issued a ruling by letter dated November 16, 1972, assessing a penalty of $2,000, and also ruling that the costs paid to LAIMA constituted a maritime lien on the M/V Clare E. Beatty in the amount of $763.50. The letter stated that the negligence on which the charge of "knowing discharge" was based was that the man who was apparently posted to watch the discharge was found cleaning the Pilot House while the discharge was taking place.

It was further stated that the oil slick had spread to approximately 200–300 ft. in diameter and that the watchman shut down the forward pump when the discharge was called to his attention by a witness from the Ohio River Service Company. It was then stated that "[h]e subsequently failed to observe a lesser discharge of oil coming from the after [sic] pump which was again called to his attention by an employee of Ohio River Service Co."

The letter pointed out that the defendant had the right to an informal hearing

which did not require a personal appearance, but made a personal appearance permissive. It requested that payment of December 4, 1972 be made. Captain Beatty responded with a three page letter requesting an open hearing to be held at Louisville. On December 19, 1972, E. A. Schmidt, Captain in the Coast Guard and Chief, Marine Safety Division, responded to Captain Beatty's letter and stated that a hearing had been scheduled in St. Louis on January 9, 1973.

Captain Beatty then responded by letter dated December 26, 1972 stating that he felt the matter should be handled in a United States District Court rather than in the office of the Coast Guard at St. Louis, since all interested parties would be readily available as witnesses in Louisville.

On March 5, 1973, the Coast Guard, through Captain Schmidt, advised Captain Beatty that he had been offered an opportunity for a hearing and that no personal appearance is required under the statute, and that the matter which he had submitted for consideration and the three letters had been considered, whereupon Captain Schmidt assessed the penalty of $2,000. He then stated that Captain Beatty had the right to appeal this decision to the District Commander, but that if no appeal of payment was received by March 26, 1973, the case would be forwarded to the United States Attorney for collection.

Captain Beatty then responded by letter dated March 23, 1973 and stated that he had no intention of going to St. Louis and indicated that he would proceed further in the district court.

Title 33 U.S.C. § 1161(b)(2) provides in part:

"(b)(2) The discharge of oil into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone in harmful quantities as determined by the President under paragraph (3) of this subsection, is prohibited.

Title 33 U.S.C. § 1161(b)(3) in pertinent part provides:

"(b)(3) The President shall, by regulation, . . . determine for the purposes of this section, those quantities of oil the discharge of which, at such times, locations, circumstances, and conditions, will be harmful to the public health or welfare of the United States . . . ."

40 C.F.R. § 110.3 provides:

"For purposes of section 11(b) of the Federal Act, discharges of such quantities of oil into or upon the navigable waters of the United States or adjoining shorelines determined to be harmful to the public health or welfare of the United States, at all times and locations and under all circumstances and conditions, except as provided in section 110.6 of this part, include discharge which:

(a) . . .

(b) Cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."

In *United States v. Boyd*, 491 F.2d 1163, 1169 (9th Cir. 1973), the court examined the "sheen test" and found it to be reasonable. *Boyd* involved an appeal from a conviction upon a criminal information brought pursuant to 33 U.S.C. § 1161(b)(4), which makes it a crime for any captain of a vessel in the United States navigable waters to fail to notify immediately the appropriate federal agency in the event of a known discharge of oil from such vessel.

In *Boyd* a crewman on the ship was transferring diesel fuel oil from the port to the starboard fuel tank by means of a hose, which he accidentally knocked out of the starboard tank, causing approximately 30 gallons of oil to be discharged into the water, which, in turn, created a visibly iridescent slick or sheen on the surface. The court stated at p. 1168 that the "sheen test" on the facts in

that case was a valid basis for distinction between those discharges which were harmful and those which were not.

The court stated that it was true that Congress did not intend all oil discharges to be determined harmful, and that there was a certain class of *de minimus* discharges to which the sanctions of 33 U.S.C. § 1161(b)(4) did not apply. However, the court stated that in view of the fact that 30 gallons were spilled and in view of the reasonableness and workableness of "sheen tests" *Boyd's* contentions were without merit. The reasoning contained in *Boyd* at p. 1168 is persuasive here, especially since we are concerned here with what is designated as a civil penalty and *Boyd* was concerned with a criminal penalty, resulting in a one year probated sentence.

We have taken notice of defendants' contention that the District Court for the Eastern District of Louisiana in the case of *United States v. LeBeouf Bros. Towing Co., Inc.*, D.C., 377 F.Supp. 558 (1974) has taken the position that the penalty provisions of 33 U.S.C. § 1161(b)(5) are, in fact, criminal in nature and that § 1161(b)(4), which requires a guilty party to notify the Coast Guard of any oil spillage, when taken in connection with § 1161(b)(5), requires that the penalty under (b)(5) can only be enforced if it is supported by information independently derived from the statutory self-disclosure compulsion in paragraph 4, 377 F.Supp. at 568. District Judge Gordon, in that case, stated that to rule otherwise would contravene the legislative privilege against self-incrimination afforded to the party who notified the government.

While we note that *United States v. LeBeouf Bros. Towing Co., Inc., supra*, is on appeal to the Fifth Circuit, we are not disposed to stay our hand in disposing of this case, since there is no self-incrimination problem involved here, as the information concerning the oil spillage came to the Coast Guard from a third party rather than from the defendant. We do observe, however, that there

are phrases used in § 1161(b)(5) which are ordinarily used in criminal statutes, but we see no need to delve into an analysis of the statute which has been done in depth in *LeBeouf*.

The defendant initially is contending that the punishment does not fit the crime, and that a $2,000 fine is disproportionate to the amount of oil which was spilled. He is also contending that had the oil not been discharged the ship might have sunk and, thus, have caused a much larger quantity of oil to pollute the river.

■ We believe that both contentions are without legal merit, even though we ourselves might have imposed a smaller penalty had the matter been addressed to us for determination. Ten or fifteen gallons, while not de minimis and while passing the "sheen test", represents what might be thought of as a very small amount of oil. However, the purpose of the statute is to prohibit any oil, which causes a sheen on the water, from being discharged, and within the framework of the statute, if that occurs, fines of up to $10,000 could be assessed against the offending ship owner.

■ Therefore, the fine is within the limits imposed by the law, and this Court has no authority to reduce it or to eliminate it. See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and *United States v. Norfolk Dredging Company*, Civil Action 73–487 (E.D.Va. 1974). It should also be observed that the defendants have failed to exhaust their administrative remedies.

■ As to defendants' second contention, it is obvious that the boat was not sinking at the time when Captain Beatty went to Louisville to get a fitting, and that he considered matters to be under control, since he left the vessel in the charge of an 18 year old deck hand. Furthermore, he had instructed the deck hand not to allow oil to be discharged into the river, but this instruction was not followed; therefore, the argument

of extreme emergency is without substantial weight and must be denied.

Finally, the defendants' contention is that the charges for cleaning the oil sheen are excessive and represent an overkill on the part of the government. While this argument would carry considerable weight with the Court, if the statute required that the government recover its reasonable expenses incurred, the language of the statute is concerned only with the recovery of actual expenses made by the government. See 33 U. S.C. § 1161(f)(1).

In conclusion, judgment in accordance with these findings of fact and conclusions of law will be entered, granting the United States the relief sought by it under the first, second and third causes of action. The United States' fourth cause of action, based upon 33 U.S.C. § 407, must be dismissed, since that statute and Title 33 U.S.C. § 411 refer to criminal penalties and a defendant under those statutes must be proceeded against by way of information or indictment.