**L. O. WARD, Plaintiff,**

v.

**William G. COLEMAN, Jr., Individually and as Secretary of Transportation for the United States of America, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**L. O. WARD and L. O. Ward Oil and Gas Operations, Defendants.**

Nos. CIV–76–0303–E, CIV–76–0456–E.

United States District Court,
W. D. Oklahoma.

Dec. 22, 1976.

Stephen Jones and James H. Gungoll, Enid, Okl., for L. O. Ward.

David L. Russell, U. S. Atty., and Richard F. Campbell, III, Asst. U. S. Atty., Oklahoma City, Okl., Bruce J. Chasan, and Earl Salo, Attys., Dept. of Justice, Washington, D.C., for U. S.

Harold B. Scoggins, Jr., Gen. Counsel, Independent Petroleum Association of America, Washington, D.C., amicus curiae.

## MEMORANDUM OPINION AND ORDER

EUBANKS, District Judge.

33 U.S.C. § 1321(b) provides, in pertinent part:

> "The discharge of oil or hazardous substances into or upon the navigable waters of the United States . . . is prohibited . . . . .
>
>     \*    \*    \*    \*    \*    \*
>
> "Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged . . . shall be assessed a civil penalty . . . of not more than $5,000 for each offense. . . . ."

On or about March 23, 1975, oil overflowed from an open-earth pit at a drilling site owned and operated by L. O. Ward and L. O. Ward Oil and Gas Operations and flowed into Boggie Creek, Garfield County, Oklahoma. A report of the incident was submitted by Ward and received by the Dallas office of the Environmental Protection Agency on or about June 25, 1975. The report was referred to the Second United States Coast Guard District and on the 19th of December, 1975, its Commander assessed a civil penalty of $500 against Ward.[1] On December 26, 1975, Ward appealed the assessment to the Commandant of the Coast Guard, which appeal was denied on February 11, 1976.

On April 13, 1976, Ward brought action in this court for injunctive and declaratory relief, praying that a three-judge court[2] declare unconstitutional and enjoin the enforcement of certain provisions of 33 U.S.C. §§ 1318, 1319, 1321 and of 40 C.F.R. 110.[3] On June 4, 1976, the United States of America sued Ward and L. O. Ward Oil and Gas Operations to collect the unpaid penalty. The actions have been consolidated.[4]

Now before the court for disposition is defendants' motion for judgment on the pleadings or for summary judgment. Defendants argue that they are entitled to judgment as a matter of law because the penalty imposed is criminal or quasi-criminal and thus the self-reporting provision violates the protection against self-incrimination afforded by the Fifth Amendment to the Constitution of the United States; because the penalty is imposed without regard to fault, and such strict liability violates the protection against undue process afforded by the Fifth Amendment; and because the regulatory "sheen" test is not such a definition of harmful quantities of spillage as is authorized by the FWPCA.[5]

## CHARACTERIZATION OF THE PENALTY IMPOSED

█ "The question of whether a given sanction is civil or criminal is one of statutory construction." *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237, 93 S.Ct. 489, 493, 34 L.Ed.2d 438 (1972);

---

1. No contention is made that the Commander failed to observe the requisites of notice and opportunity to be heard.

2. The motion to convene a three-judge court was denied conditionally on April 27, 1976, and unconditionally on August 26, 1976, on the ground no substantial challenge to the constitutionality of the statute was presented.

3. For the purpose of simplification, the challenged provisions of the statute will be referred to as the reporting and penalty provisions of the Federal Water Pollution Control, Act (FWPCA); the challenged provision of the regulation as the "sheen" test.

4. Hereinafter, Ward and/or L. O. Ward Oil and Gas Operations will be referred to as "defendant[s]."

5. The Independent Petroleum Association of America has filed a brief amicus curiae joining in defendants' contentions and urging further that the court invalidate the "sheen" test as a denial of the equal protection of the laws.

*Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 82 L.Ed. 917 (1938).

The sections of the FWPCA under attack read in pertinent part:

"(5) Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

"(6) Any owner or operator of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3) of this subsection shall be assessed a civil penalty by the Secretary of the department in which the Coast Guard is operating of not more than $5,000 for each offense. No penalty shall be assessed unless the owner or operator charged shall have been given notice and opportunity for a hearing on such charge. Each violation is a separate offense. Any such civil penalty may be compromised by such Secretary. In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary."

■ That Congress has labelled the penalty provided for in subsection (6) "civil" is entitled to due consideration. *United States v. J. B. Williams Co., Inc.,* 498 F.2d 414, 421 (2d Cir. 1974). Provision for administrative imposition of the penalty is indicative of congressional intent to impose a civil sanction. *Helvering, supra* at 402, 58 S.Ct. 630.

■ However, it is not only the characterization given that section by Congress which is significant, but its juxtaposition with and distinction from the preceding subsection's provision for criminal penalty. "The fact that the sanctions were separate and distinct and were contained in different parts of the statutory scheme is relevant in determining the character of the [penalty]." *One Lot Emerald Cut Stones, supra* 409 U.S. at 236, 93 S.Ct. at 493.

■ This court is of the opinion that subsection (6) is unambiguous and that congressional intent to impose a civil penalty can be discerned from its face.[6] That determination would be an end to this matter were the issue before the court solely one of statutory construction. But the (noncorporate) defendants in this case have raised constitutional issues, and inquiry beyond the face of the statute should be undertaken "when some constitutional protection is implicated by the imposition of a penalty." *United States v. LeBeouf Bros. Towing Co., Inc.,* 537 F.2d 149, 151 (5th Cir.

---

**6.** See *United States v. LeBeouf Bros. Towing Co., Inc.,* 537 F.2d 149 (5th Cir. 1976). That court stated that inquiry into the nature of the penalty is necessary only if the statutory language is ambiguous or a constitutional right is involved. At 151. Finding no Fifth Amendment issue properly before it, the protection against self-incrimination not being available to the corporate defendants, the court determined "the issue is purely one of statutory construction, and appellees are foreclosed by the clear statutory wording. . . . Congress . .

expressly labeled the sanction in 33 U.S.C. § 1161(b)(5) [the predecessor to 33 U.S.C. § 1321(b)(6)] . . . a 'civil penalty.' Only the most compelling demonstration of a contrary legislative intent would persuade us to ignore the plain words of the statute." At 152.

But see *United States v. General Motors Corp.,* 403 F.Supp. 1151, 1158 (Conn.1975), in which the *Mendoza-Martinez* tests were applied because "the congressional intent is ambiguous."

1976); *United States v. J. B. Williams Co.,* *supra* at 421.

■ The court deems such inquiry properly made by application of the criteria set forth in *Kennedy v. Mendoza-Martinez,* "the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character," to wit:

"whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned  .  . .." 372 U.S. 144, 168–169, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963).

### a. Affirmative Disability or Restraint

■ The question is not whether there is, or there is no, affirmative disability or restraint imposed, but whether the affirmative disability or restraint imposed is of a civil or criminal nature. This court concludes that the facts that only a monetary sanction is imposed and its collection is effectuated through a civil procedure bespeak of a civil penalty. See also *United States v. Eureka Pipeline Co.,* 401 F.Supp. 934, 939 (N.D.W.Va.1975).

### b. Historical Characterization

The result of this test can only be inconclusive: clearly, fines have long been meted out to sanction criminal conduct; on the other hand "civil penalties are not uncommon in federal law." *American Smelting & R. Co. v. OSHRC,* 501 F.2d 504, 515 (8th Cir.

7. In 1972, by amendment, the scienter requirement was eliminated.

8. If there be any intent to punish, it would be the intent to punish the act of not reporting an oil spill.

1974); *Frank Irey, Jr., Inc. v. OSHRC,* 519 F.2d 1200, 1204 (3d Cir. 1975).

### c. Scienter

■ "This factor clearly points toward the remedial function of the § 1321(b)(6) penalty, since there is no requirement of *scienter* in the present statute." [7] *United States v. General Motors Corp.,* 403 F.Supp. 1151, 1162 (Conn.1975).

### d. Purpose of the Sanction

Defendants contend that both the intent and the effect of the imposition of this penalty is "to punish spillers of oil."

■ The court does not agree that the provision for a penalty was designed to effect retribution. "[T]he basic thrust of § 1321(b)(6)  .  .  . is aimed less at the *acts* of polluters than at the resulting pollution itself." [8] *General Motors, supra* at 1162.

The FWPCA declares its objective to be "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). Congress sought to facilitate achievement of this goal by, *inter alia,* including the self-reporting and penalty provisions "to prevent harmful spills [9] and to minimize the damage caused by such spills." [10] *LeBeouf Bros., supra* at 152.

■ That such provisions may promote the traditional criminal law aim of deterrence does not make the penalty, *ipso facto,* a criminal one. Indeed, it would be difficult to divorce the deterrent function from a regulatory scheme. "Business is encouraged to comply with the law not only because that is what the law exacts but because failing to do so will bring down on the activity or purse noncriminal consequences." *Atlas Roofing Co. v. OSHRC,* 518 F.2d 990, 1009 (5th Cir. 1975).

9. "[B]y making care more economical than carelessness." *General Motors, supra* at 1162.

10. By establishing in § 1321(k) "a 'revolving fund' into which all fines received under the Act are to be deposited to defray the cost of oil removals." *LeBeouf Bros., supra* at 153.

### e. Whether Such Behavior is Already a Crime

The spilling of oil could be punished criminally. Rivers and Harbors Act, 33 U.S.C. §§ 407, 411. However, one who reports a spill would be entitled to invoke the immunity provision of § 1321(b)(5). The two courts which have had occasion to apply this test to this Act have deemed the result inconclusive. *General Motors, supra* at 1163; *Eureka Pipeline, supra* at 940.

### f. Alternative Purpose

The court has already determined that the deterrent effect is an "unavoidable by-product" [11] of the Act's primary objectives. Inasmuch as the purpose of the penalty is to defray the costs of the Act's administration and of clean-up expenses, and is therefore clearly compensatory and remedial, there is no need to search for some alternative [i. e., alternative to a punitive] purpose.

### g. Whether Penalty is Excessive

The maximum penalty which may be assessed is $5,000.[12] Given the cost which could be incurred in removing harmful discharges, that amount does not appear excessive. Furthermore, it is significant that Congress has provided that certain "mitigating" factors [13] may be taken into account in assessing the penalty; such "flexibility" indicates the civil character of the sanction. *General Motors, supra* at 1163. See also *Eureka Pipeline, supra* at 941.

The court concludes that the penalty provided for is a civil penalty, purposed to effectuate a regulatory and remedial scheme in which self-reporting is properly required.[14]

---

11. *General Motors, supra* at 1163.

12. Reduced from the original $10,000 provision by amendment in 1972.

13. See latter part of subsection (6) quoted at page 1355 herein.

14. See *California v. Byers,* 402 U.S. 424, esp. 429–431, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971).

## STRICT LIABILITY AND DUE PROCESS

The essence of strict liability is the shifting of accidental loss, as between non-negligent parties,[15] to the one most able to insure against the risk and bear the cost. In the FWPCA, Congress has chosen to shift the cost of damage done to the environment from the public to the owner or operator of the facility from which a harmful discharge emanated. Congress further saw fit to minimize defenses, in order to inspire "performance rather than excuses." [16] This court agrees with the United States District Courts of Connecticut and the Northern District of West Virginia that the imposition of penalty after notice and hearing and after due regard given ability to pay and the gravity of the violation, withstands constitutional attack. *General Motors, supra* at 1157; *Eureka Pipeline, supra* at 942.

## THE SHEEN TEST

The FWPCA, § 1321(b)(3), prohibits:

"The discharge of oil or hazardous substance into or upon the navigable waters of the United States, adjoining shore-lines, or into or upon the waters of the contiguous zone in harmful quantities as determined by the President under paragraph (4) of this subsection . . . ."

Subparagraph (4) provides:

"The President shall by regulation, . . . determine for the purposes of this section, those quantities of oil and any hazardous substance the discharge of which, at such times, locations, circumstances, and conditions, will be harmful to the public health or welfare of the United States . . . ."

---

15. The court does not thereby intend any inference as to the degree of culpability, if any, of defendants in this case.

16. *United States v. White Fuel Corp.,* 498 F.2d 619 (1st Cir. 1974).

The authority to define harmful quantities was delegated by the President to the Secretary of the Interior. The resulting regulation, 40 C.F.R. § 110.3, provides:

"For purposes of section 11(b) of the Federal Act, discharges of such quantities of oil into or upon the navigable waters of the United States or adjoining shorelines determined to be harmful to the public health or welfare of the United States . . . include discharges which:

"(a) Violate applicable water quality standards, or

"(b) Cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."

The issue before the court is whether defendants have carried their heavy burden of showing "that the sheen test determination of harmfulness cannot be considered a reasonable expression of the Congressional will." *United States v. Boyd*, 491 F.2d 1163 (9th Cir. 1973).

Congress did not intend that every discharge be deemed harmful; it intended that de minimus discharges, and discharges "from a properly functioning vessel engine" [17] be exempted from the definition. The sheen test distinguishes the harmful from the de minimus spill on the basis of what can be observed, rather than measured. The Court of Appeals for the Ninth Circuit has reasoned:

"As a practical matter, the sheen test is more appropriate than, for example, a numerical test, or a determination that a 'substantial' amount of spilled oil is harmful. A numerical test creates not only the inherent difficulty of accurate observation as to the quantity discharged, it also may spawn an incentive to be inaccurate so as to avoid the obligation of reporting. Moreover, if the term 'substantial' were used, there would be endless confusion over its meaning." *United States v. Boyd, supra* at 1168.

That court concluded: "Nothing has been shown, on the facts in this case, to indicate that the Department's Regulations determining harmfulness go beyond the statuto-

---

**17.** It is this distinction which amicus curiae contends renders the sheen test violative of equal protection. The Ninth Circuit has inquired into the exemption at length, in *United States v. Boyd, supra* at 1169:

"Appellant further contends that the exception to the sheen test—i. e., 'discharges of oil from a properly functioning vessel engine . . .'—demonstrates the irrationality of the sheen test itself. He points out that this exception allows a ship captain to escape the nonreporting penalty for any amount of oil spilled from a properly functioning engine, whether or not it is enough to create a sheen. In other words, the harmfulness of the spill is made to depend on its source. While at first blush this may seem a curious result, we are persuaded that the exception is reasonable.

. . .

"Determination of harmfulness 'to the public health or welfare of the United States' requires balancing the competing interests of environmental protection and unrestricted passage on navigable waters. It is precisely this balancing which the 'properly functioning engines' exception reflects. Indeed, the exception was included in the Regulations at the behest of Congress. When the Regulations were originally proposed, after passage of the Act, the sheen test did not contain the

exception. During committee hearings on the proposed Regulations, Senator Muskie remarked:

. . . At a minimum the President can and should immediately by regulation prohibit the discharge of oil which exceeds the amount normally anticipated in operation of a vessel. . .

It is obvious, then, that *both committees* [the House and Senate committees working on the bill] *felt that the minimal amounts of oil discharged in the normal operation of a properly functioning vessel engine ought not to be subject to the notice requirements of the law. . . . (Emphasis added.)"* [Citation omitted.]

After these hearings, the exception was adopted by the Department." 40 C.F.R. § 110.6.

The regulation thus was a reflection of congressional intent to discriminate in favor of a specific class so as to avoid unduly burdening waterway traffic and commerce. Unequal protection is not precluded by the Fifth Amendment, but only such discriminatory classification—not involved here—as is so arbitrary and injurious as to violate due process. *Detroit Bank v. United States,* 317 U.S. 329, 337–38, 63 S.Ct. 297, 87 L.Ed. 304 (1943).

ry mandate." At 1170. Other courts have agreed. *United States v. Chevron Oil Co.,* CIV–74–400 (E.D.La., filed Oct. 11, 1976); *United States v. Beatty, Inc.,* 401 F.Supp. 1040 (W.D.Ky.1975). This court does too.

Accordingly,

IT IS ORDERED that defendants' motion for judgment on the pleadings or for summary judgment be and the same hereby is denied.